**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **DONNA-KAY E. ARMSHAW** | |
| **AND** | |
| **STEPHEN P. ARMSHAW** | **CIVIL ACTION NO.: 2:21-01398** |
| Plaintiffs | **SECTION: "H" (5)** |
| **VERSUS** | **JUDGE MILAZZO** |
| **NEW ORLEANS MILITARY AND MARITIME ACADEMY, INC.;** | **MAGISTRATE JUDGE NORTH** |
| **VOLTAIRE ALEXANDER CASINO**, *in his individual capacity and in his official capacity as a teacher at NOMMA/OPSB employee;* | |
| **AND** | |
| **ORLEANS PARISH SCHOOL BOARD.** | |

*************************************************************************

<u>**AMENDED COMPLAINT FOR DAMAGES**</u>

*"My reality has mixed with terrors not ever remembered. I want to stay. I want to feel. I want to be heard and understood. I want to understand me. I miss times when I knew nothing. I hate this dependency I grew. I don't know if I'm doing this for attention or help. Since I went to <u>Mr. Casino</u>, I've been having weird imaginings. When I recall them, I get panic attacks. It takes me some time to remember what happens in them if they're real."*—V.A.

**BACKGROUND FACTS**

1.

V.A. was a student at NEW ORLEANS MILITARY AND MARITIME ACADEMY, INC. ("NOMMA") from August 2018 until the time of her suicide on November 4, 2020.

2.

Unbeknownst to her family, V.A. struggled with dark thoughts during the 2019-2020 school year.

3.

V.A.—a sixteen-year-old girl who was already struggling psychologically after she had been raped on July 4, 2019—also struggled with the isolation of online courses during the Covid-19 shutdown of her school; with the continued, persistent bullying from her classmates and peers at school (including her alleged rapist threatening her and throwing a knife at her feet while she was at school); with the after-effects of an attempted suicide; and with depression and ongoing suicidal ideations.

4.

V.A. told one of her teachers, Voltaire Alexander Casino ("Casino"), about all these things. As explained in more detail below, Casino never reported any of these things to V.A.'s parents or the school administration.

5.

V.A.—a creative soul—poured many of her feelings into her drawings and writings.  She even created a coded, written language.  V.A. wrote in her notebook, in her secret language:

*"My reality has mixed with terrors not ever remembered. I want to stay. I want to feel. I want to be heard and understood. I want to understand me. I miss times when I knew nothing. I hate this dependency I grew. I don't know if I'm doing this for attention or help. Since I went to <u>Mr. Casino</u>, I've been having weird imaginings. When I recall them, I get panic attacks. It takes me some time to remember what happens in them if they're real."*—V.A.

6.

Casino was her biology instructor at NOMMA.

7.

Instead of reporting V.A.'s trauma to people who would have helped her, Casino regularly communicated with her through a series of intimate exchanges—even when she was not in school and even when he was no longer instructing her.

8.

Shortly before V.A.'s death, Casino also asked Tesia Williams ("Williams"), a counselor at NOMMA, to send V.A. suicide prevention materials.

9.

Williams never reported this incident to V.A.'s parents. Upon information and belief, Williams never reported this exchange to the school administration. All she did was send V.A. an email with links to suicide hotlines.

10.

As explained in more detail below, no one ever notified V.A.'s family about these issues.

11.

Instead, they sat on this information until V.A.'s thoughts became too much for her to bear and she committed suicide on November 4, 2020.

## PARTIES

Proper Claimant for Survival And Wrongful Death Actions Under Louisiana Law:

12.

DONNA-KAY E. ARMSHAW ("Mrs. Armshaw") is the surviving, biological mother of the deceased, minor child, V.A. ("V.A."), the direct victim of Defendants' negligence and civil rights violations.

13.

STEPHEN P. ARMSHAW ("Mr. Armshaw") is the surviving, legally-adoptive father of the deceased, minor child, V.A. ("V.A."), the direct victim of Defendants' negligence and civil rights violations.

14.

At the time of her death, V.A. was a minor and, as such, was unmarried.  V.A. did not have any children.   Accordingly, her surviving mother and father are the proper survival action claimants for the injuries and damages she suffered immediately prior to her death pursuant to Louisiana Civil Code Article 2315.1(A)(1-2).  They are also the proper claimants to pursue a wrongful death action for her own injuries and damages that occurred as a result of V.A.'s wrongful death pursuant to Louisiana Civil Code Article 2315.2(A)(1-2). Mr. and Mrs. Armshaw are of the age of majority and domiciled in Houston, Texas.

15.

Made defendants herein are:

A. NEW ORLEANS MILITARY AND MARITIME ACADEMY, INC., (hereinafter, "NOMMA"), a Louisiana non-profit corporation, authorized to do and doing business in the State of Louisiana, located at municipal address 425 O'Bannon St., New Orleans, Louisiana 70114, who upon information and belief was at all times relevant herein the entity that employed VOLTAIRE ALEXANDER CASINO.  NOMMA was a public school and a Type 2 Charter school whose charter was issued by the Louisiana Department of Education ("LDE") and/or the Louisiana Board of Elementary and Secondary Education ("BESE").

B. VOLTAIRE ALEXANDER CASINO ("Casino"), is a person of the full age of the majority who upon information and belief is a resident of and domiciled in Harris County, State of Texas, who at all times relevant herein was an employee of NOMMA and a resident of and domiciled in Orleans Parish, State of Louisiana.

**VENUE**

16.

Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the clam occurred in this judicial district (specifically the Parishes of Orleans and Jefferson).

**JURISDICTION**

17.

Subject matter jurisdiction over the federal civil rights claim is conferred on this Court by 28 U.S.C. §§ 1331 and 1343(3) and (4).  Subject matter jurisdiction over the state law claims is conferred by 28 U.S.C. 1367(a).

18.

This Court has personal jurisdiction over Defendants, NEW ORLEANS MILITARY AND MARITIME ACADEMY, INC. and VOLTAIRE ALEXANDER CASINO, because they caused injury to Mr. and Mrs. Armshaw and V.A. through acts or omissions which occurred within the State of Louisiana.

**FACTS REGARDING SUICIDE AND BULLYING GENERALLY**

19.

According to the Center for Disease Control and Prevention ("CDC"), suicide is the second leading cause of death for people ages 10-34 and the 10th leading cause of death in the United States overall, and the highest suicide rates are among American Indian/Alaska Native populations.[1]

20.

Bullying leads to suicide.  Studies have found that bullying is a significant contributor to suicidal ideation.[2]

---

[1] https://www.cdc.gov/suicide/facts/index.html.
[2] Suicidal ideation among suburban adolescents: The influence of school bullying another mediating risk factors.  J. Child Adolesc. Ment. Health, 2016 Oct.; 28(3): 213–231.

21.

Physical assault is also associated with increased odds of suicidal ideation.[3]

22.

A review of cross-sectional and longitudinal findings showed that "there is an increased risk of suicidal ideation and (or) suicide attempts associated with bullying behavior."[4]

23.

As educators, Defendants were aware of the link between bullying and suicide in school children.

**FACTS REGARDING BULLYING POLICY AND SUICIDE PREVENTION IN LOUISIANA AND AT NOMMA**

24.

Additionally, in 2008 the Louisiana Legislature enacted the Jason Flatt Act, mandating that schools offer a youth suicide prevention program.[5]

25.

Subsequently, in 2019, the Louisiana Legislature amended the Jason Flatt Act to provide a mechanism for tracking whether schools actually followed through on their obligation to offer a youth suicide prevention program.

---

[3] Associations of childhood bullying victimization with lifetime suicidal behaviors among new U.S. Army soldiers. Depress Anxiety, 2017 Apr. 3.
[4] The Association of Suicide and Bullying in Childhood to Young Adulthood: A Review of Cross-Sectional and Longitudinal Research Findings.
[5] La. R.S. 17:431.1 *et seq.*

26.

Under the Jason Flatt Act, the governing authority of each secondary school is obligated to document and verify that all covered school employees have received the mandatory suicide prevention training outlined in the Act.

27.

The training required by the Jason Flatt Act requires, among other things, (1) training to increase awareness of suicide risk factors, (2) training on how teachers should respond to suspicious behavior or warning signs, and (3) policies and protocols for communication with parents.

28.

NOMMA, through its governing authority, was required to provide mandatory suicide prevention training to its staff, including teachers like Casino and counselors like Williams.

29.

Hundreds of Louisiana schools reported their compliance with the law for the 2020–2021 school year and were listed on the Louisiana Department of Education's website as Suicide Prevention Certified Schools.[6]

30.

By contrast, NOMMA chose not to comply with the mandatory training and training reporting requirements of the Jason Platt Act; it was not listed as a Suicide Prevention Certified

---

[6]             https://www.louisianabelieves.com/docs/default-source/public-school/suicide-prevention-certified-schools.pdf?sfvrsn=a7de9b1f_6

School for the 2020–2021 School Year.  NOMMA did not implement the mandatory provisions

of the Jason Flatt Act or make any training required by the act.  It did not make a good faith attempt

to comply with the Jason Flatt Act.  To the contrary, it willfully—or in the alternative, wantonly—

disregarded the mandatory training requirements of the Jason Flatt Act.

31.

NOMMA's 2020-2021 Cadet Parent Handbook[7] has an Anti-Bullying Policy, including

the following:

- "Respect for the dignity of others is a cornerstone of civil society.  Bullying creates an atmosphere of fear and intimidation, robs people of their dignity, detracts from the safe environment necessary to promote cadet learning, and will not be tolerated by the faculty, staff, and administration of NOMMA."

- "Bullying is any behavior or pattern of behavior by a cadet, or a group of cadets, that is intended to harass, intimidate, ridicule, humiliate, or instill fear in another child or group of children.  Bullying also includes unacceptable behavior identified in this policy which is electronically transmitted. Bullying behavior can be a threat of, or actual, physical harm or it can be verbal abuse of the child. Bullying is a series of recurring actions committed over a period of time directed toward one cadet or successive, separate actions directed against multiple cadets. Bullying, like other disruptive or violent behaviors, is conduct that disrupts both a cadet's ability to learn and the school's ability to educate its cadets in a safe environment."

- "All school employees are required to report alleged violations of this policy."

32.

Casino never reported any bullying incidents, despite his knowledge of those incidents.

33.

In fact, V.A.'s school file does not have any record of her repeated victimization.

---

[7] Exhibit 1, Cadet Parent Handbook.

**FACTS LEADING UP V.A.'S SUICIDE: DEFENDANTS CHOSE TO KEEP MR. AND MRS. ARMSHAW IN THE DARK ABOUT V.A.'S DEPRESSION, VICTIMIZATION, AND SUICIDAL THOUGHTS**

34.

Upon information and belief, at all times relevant to this suit, NOMMA maintained a "Parent Contact Log" on each student; each time a NOMMA employee contacted a student's parent or guardian, the employee was supposed to log the communication in the Parent Contact Log.

35.

V.A.'s Parent Contact Log has 61 entries, running from August 15, 2018 to October 28, 2020.

36.

Casino did not log *a single* entry in the Parent Contact Log. Yet, Casino had extended, personal correspondence with V.A. at all hours of the day and night in the year prior to her death, including a voluminous email exchange on the NOMMA email server, Google Class messaging exchanges, and emails through their personal email addresses.

37.

Of the 61 entries, 9 came from Williams. All Williams' entries included mundane information, including V.A.'s problems with logging on and internet connectivity; class change requests; PSAT participation, recommendation letters, and AP course offerings.

38.

Additionally, while V.A. was on the NOMMA campus in fall of 2019, her ex-boyfriend, M., bullied and assaulted her, threw a knife at her feet, called her a "ho," and had other girls tease and threaten her.

39.

NOMMA not only allowed these incidents to happen, but it also never reported these incidents to V.A.'s parents.

**NOMMA—THROUGH V.A.'S COUNSELOR—HAD ACTUAL KNOWLEDGE OF V.A.'S SUICIDAL THOUGHTS AND THE FACT THAT SHE WAS BEING PSYCHOLOGICALLY TORMENTED BY HER ALLEGED RAPIST**

40.

On <u>May 4, 2020</u>, Mrs. Williams was told about how V.A.'s obsessive ex-boyfriend and alleged rapist was bullying and harassing her, asking intimate questions about her relationship to her current boyfriend, and sending suicide notes and a will to V.A., and planning to send V.A. a "special surprise."  She received screenshots showing some of these exchanges.  Yet, there is not a single entry on the Parent Contact Log showing Mrs. Williams contacted V.A.'s parents about the relentless bullying and harassment she was enduring from her alleged rapist.  Mrs. Williams never contacted V.A.'s parents about this issue.

41.

On <u>October 4, 2020</u>, Williams emailed V.A., stating, "Good afternoon.  Mr. Casino felt that it would be good for you to have some resources.  Please use these resources, they could be beneficial."  She listed three resources with a brief blurb about which each of them were

(*e.g.*, "*National Suicide Prevention Lifeline (1-800-273-8255) Provides 24/7, free and confidential support for people in distress, prevention and crisis resources for you or your loved ones, and best practices for professionals."). Williams never confirmed that V.A. had received her email. She never confirmed that V.A. could access the resources. She never asked V.A. or Casino what had prompted Casino's request for these resources. She never told V.A.'s parents that she had sent V.A. these resources at the request of Casino.

42.

That email included contact information for three programs: (1) Cope Line (a telephonic counseling service hotline that provided, among other services, suicide prevention and crisis counseling), (2) Family Service of Greater New Orleans Child and Adolescent Response Team (a program to provide crisis counseling and intervention to children and their families); and (3) National Suicide Prevention Lifeline (a suicide prevention hotline that also provides resources to professionals on how to handle and help a potentially suicidal individual).

43.

Yet, despite the fact that Williams knew V.A. was a suicide risk and emailed her suicide resources, there is not a single entry on the Parent Contact Log showing Williams contacting V.A.'s parents about her depression and suicidal thoughts.

44.

Mrs. William's last entry on V.A.'s Parent Contact Log was <u>September 23, 2020</u>.

**CASINO HAD ACTUAL KNOWLEDGE OF
V.A.'S TRAUMATIC RAPE, HOW SHE WAS BEING TORMENTED BY HER PEERS,
AND HER SUICIDAL THOUGHTS**

45.

Casino had even more details about the psychological issues plaguing V.A..

46.

Through their NOMMA email accounts (vcasino@nomma.net and cadetvarmshaw@nomma.net), Casino engaged in bizarrely intimate email exchanges with V.A. from April 2020 until October 2020 that included everything from gripes about family and friends to admissions that V.A. viewed Casino as more than an instructor to admissions of suicide attempts. Weirdly, he did not treat V.A. like other students, but instead treated other students as beneath her by sending emails with an inappropriate, informal, and relaxed tone. For instance, on Thursday, April 23, 2020, when V.A. asked if Casino knew her brother, the following exchange occurred:

Casino: "I don't remember him. What'd he say about me?"

V.A.: "He said it was a rotation he never paid attention or gave a fuck, but you were the teacher and seemed ok. I don't know exactly why he brought it up though lol."

Casino: "That was probably my first year at NOMMA. I was teaching ACT prep and then Geometry that year."

V.A.: "It would've been 2 year ago if he was a senior, his girlfriend says she knew you too or of you or something she said you were aggravating though, her name's [V.R.]. (I don't take her as one for liking to figure things out though)"

Casino: "So my guess is I didn't teach her long enough for her to understand why I do what I do, or, and I'll be frank, is she stupid?"

V.A.: "She's rather slow I guess.  She's not good at picking things up sometimes, especially socially and very immature.  She seems like she would be booksmart though."

Casino: "Book smart doesn't mean much to me.  I mean, you saw your biology class."

47.

These emails occurred at all hours of day and night.

48.

These emails also reference other communications between V.A. and Casino (*e.g.*, Google Class messaging per a 4/22/2020 email; Casino also agreed to provide her with his personal email address on May 7, 2020).   Additionally, Casino had communications with V.A. through his personal cell phone.

49.

Aside from the NOMMA emails, many of the other communications were mysteriously deleted *after* V.A.'s death by an iPhone 11 Pro.

50.

V.A.'s phones are currently still being examined by the police department.

### *Casino Knew About V.A.'s Traumatic Rape But Never Reported It*

51.

On <u>May 5, 2020</u>, V.A. confided in Casino that she had been sexually assaulted:

V.A.: "I was kinda hoping he wasn't bullshitting this time.  If he was gone my problems would be cut in half.  I wouldn't be so nervous to open up my email anytime I had 1 new message or freaked out whenever my dog barks at a bird

14

through the window.  I don't want to think like that but at the same time, didn't wanna do half the shit I've done since last July.  **Ya know before anything happened I used to wonder why assault victims remembered everything so vividly, the dates and everything, or why they would defend the person who hurt them for a while.  I get it now though.**  It doesn't leave my head and my way of coping was telling myself it was fine, that's what people do, no harm done, forget the bad and remember the good type of shit.  Once I stopped that though everything started hitting me a lot harder.  All the bad came back, I had no more reason to say it was ok.  Actually almost everything became not ok.  The first time anything happened was July 4th at 10:57 am.  **I kept saying no and making excuses and when that didn't work he pushed me down and I remember just crying to myself saying it'll be over soon, no damage.  After everything became 'not okay' I don't sleep anymore really, my eating habits got worse, I don't do anything productive and crying is a great pass time among other things.**  I was hoping if he went though the problems would too."[8]

There is no entry showing this on V.A.'s Parent Contact Log about the rape from anyone at NOMMA, including Casino.  Casino never reported this to V.A.'s parents.  Upon information and belief, Casino never reported this crime to anyone—not even CPS or law enforcement.

### *Casino Knew About How V.A. Was Being Bullied and Tormented by Her Peers But Never Reported It to Her Parents—Even Though He Knew This Type of Information Should Be Reported*

52.

Casino knew that V.A.'s ex-boyfriend and alleged rapist, M., was bullying and harassing V.A. and telling her he was going to kill himself.  On May 4, 2020, V.A. emailed Casino, telling him about one of these incidents and saying that she was scared.  Casino passed this information along to Williams, but he never reported this to V.A.'s parents.  There is no entry showing this on V.A.'s Parent Contact Log about the rape from anyone at NOMMA, including Casino.  Upon

---

[8] Emphasis added.

information and belief, when Ms. Casino learned that a male student, M.[], was potentially

suicidal, he immediately sent screenshots to Ms. Williams; by contrast, for V.A., a female student,

he ignored repeated references to suicidal ideations.

> V.A.: [9:17 PM] "Hi Mr. Casino are you up?"

> V.A.: [9:24 PM] "Something came up and I don't know what to do, I'm feeling really bad.  I'm kind of scared."

> Casino: [10:06 PM] "What's up"

> V.A.: [10:15 PM] "M.[] was asking M.[] for my address for a 'special surprise' and he gave I to him, and he also messaged my boyfriend asking if we've done anything like that and just asking really weird questions.  When he told me that I started panicking and freaking out a bit but I got on my email and I had spam. So I opened my spam and it was another suicide notes from M.[].  I've had like 5 since I've known him.  But he sent a will too or some bullshit and I think he did it. That scared me, I don't want to be the reason someone killed themselves. Then I remembered it was M.[] and I stopped caring so much which just scared me more. Like how bad am I that someone said they were killing themselves and I didn't give a fuck I was just worried about what was coming to my door.  I don't know how to feel.  I'm scared."

> Casino: [10:40 PM] "I need you to send that information to Ms. Williams, your counselor, immediately.  Do you have a copy of the letter?"

> V.A.: [10:44 PM] "I can't do that but I'll send you the screenshots."

Casino and V.A. continued their email exchange until 11:00 PM that night.  Casino told V.A. in

that exchange that he texted the counselor about it and sent the screenshot:

> Casino: [11:00 PM] "… I texted the counselor about it.  I also sent the screenshot.  You also know why, let them handle it.  You did what was your responsibility and you should be proud of yourself for that."

53.

Shortly before her death, Casino also knew V.A. had been bullied and betrayed by her friend T.J. and that she was furious about it.

### *Casino Knew About V.A.'s Suicidal Thoughts But Never Reported It*

54.

On <u>April 22, 2020</u>, V.A. emailed Casino, admitting that she had attempted suicide and that her mother did not know about the attempt. Instead of reporting these suicidal ideations to V.A.'s parents, Casino—a lawyer and a teacher by trade—decided to play psychiatrist:

> <u>V.A.</u>: "Hi Mr. Casino. I had a dream, I think, that you were mad at me. I'm not sure it was a dream I don't want you to be mad I'm sorry, your cool don't be mad at me. I've, I'm not been doing well you probably know I, I'm sorry I'm a bad kid, I give lots of problems I'm sorry. Don't be mad."

> <u>Casino</u>: "Well, I'm not mad at you. Nor do I think you're a bad kid. And you probably shouldn't think you are either. That's why I asked you, if you saw the google class message, to do a positive self-assessment. About you and what you've learned. Not necessarily about what is around you, but you. Find what you love about yourself. And take your time to think about that."

> <u>V.A.</u>: "My phone is broken I didn't get to see it yet could we just talk for a bit though, about anything really, if you wouldn't mind. Everyone's really upset with me right now over something I did an hour or two ago and I'd just like to talk."

> <u>Casino</u>: "What did you do?"

> **<u>V.A.</u>: "I ate some pills. But my mom doesn't know and it was a low dose so it doesn't matter much. I'm ok and I flushed the rest though."**

**Casino**: **"Who is everyone if your mother doesn't know? And can you see why they'd be angry with you?"**[9]

V.A.: "I did it because everythings just getting so much worse and I never go for a second without hearing how terrible, ruined my moms life, how I was a mistake, and how I fuck up everything **so I wanted to see what it felt like and who knows maybe OD wouldn't make too much of a difference, added benefit.**[10] It was some low dose narcotics my Dr. gave me about 4 months ago that I told you about once before. The people who know are the only two people who talk to me right now really, which is a crippled kid with MD and one of his best friends (my close friends) And yes I know why they're mad it was "stupid" and "irresponsible" and I'm just doing it cause "you're a pussy" I know, they told me."

Casino: "You didn't do it 'cause you're a pussy". You friends are angry because they're concerned, and there is nothing that they can do in that situation which is very frustrating for them. Why you did it, I could take a guess, but you wouldn't like my answer.

You might feel like shit, but keep in mind that a lot of other people do too. I mean you know how MD works, life isn't exactly peachy for that person, and yet they're still here. And so are you. Just know that when you do that, you're seeking attention which you take as someone caring. Not because they don't care otherwise, but you feel as though them coming to rescue or help you is the only way you see someone caring.

Does that make sense? If you only construe the need for other people helping you as caring, that's extremely taxing on people that do care for you, which is why they become so frustrated.

But that comes from you not seeing anything about yourself that you do like. So you turn that feeling outwards. Now I'll refrain from saying what that kind of behavior is, but to curb it, you really do need to take time to assess yourself. Find something about yourself you do like. And find things that people like about you. Hopefully then you won't need to test your friends to see if they care, rather, you'll know that they do."

55.

---

[9] Emphasis added.
[10] Emphasis added.

V.A. confessed that she viewed Casino as a confidant.  On May 7, 2020, V.A. emailed Casino: "I was wondering though after I'm pulled out [of school] would it still be okay with you if I still emailed you or something.  I don't have any other person to talk to that isn't stupidly immature or that I feel at least semi-comfortable with."  There were no imminent plans to pull V.A. out of school at that time, and in fact when school resumed in the fall she was still enrolled at NOMMA.

56.

Despite saying in one breath that V.A. was just seeking attention, Casino also colluded with V.A. about getting (non-existent) evidence that her parents were pushing her to suicide.  There is no entry showing this on V.A.'s Parent Contact Log from anyone at NOMMA, including Casino.  Casino never reported this to V.A.'s parents.  Upon information and belief, Casino never reported this to anyone—not even CPS.

57.

In fact, on May 15, 2020 at 8:33 AM, V.A. emailed Casino referencing her first suicide attempt and continued suicidal ideations: V.A. "[Two years is] forever in this shitty ass place, especially when they've cut off any social interaction I can have.  **I just wish I hadn't done such a shitty job the 1st time.  That hospital trip should've been a trip to the morgue.  Everyone would feel better that way**."  There is no entry showing this on V.A.'s Parent Contact Log from anyone at NOMMA, including Casino.  Casino never reported this to V.A.'s parents.  Upon information and belief, Casino never reported this to anyone—not even CPS.

58.

After V.A. failed her first suicide attempt and told him she wished she'd ended up at the morgue, Casino should have immediately notified CPS, the police, his supervisors, and V.A.'s parents. He did not notify her parents or, upon information and belief, anyone else.

59.

The <u>May 15, 2020</u>, V.A. once again emailed Casino referencing her first suicide attempt. Even though she had already admitted that her mother did not know about her suicide attempt, and even though Casino stated he thought she was doing attention-seeking behaviors, when V.A. mentioned her encouraging her to kill herself, Casino this time implicitly stated that he believed her and urged her to get proof. There is no entry showing this on V.A.'s Parent Contact Log from anyone at NOMMA, including Casino. Casino never reported this to V.A.'s parents. Upon information and belief, Casino never reported this to anyone—not even CPS.

> <u>V.A.</u>: "Cause that's the only thing I heard when I got back, at school and at home. All the while my mom bought razor packets and pills telling me to do it better."

> <u>Casino</u>: "Did you ever record them saying this?"

> <u>V.A.</u>: "I don't have a phone or anything to record with. Not anymore anyway, so no."

> <u>Casino</u>: "Well if you can find something, that might help your situation."

> <u>V.A.</u>: "I mean is there really a case or anything to report, like I'm severely misguided on what's ok and normal and what isn't. Like would anything really happen or would it just start more shit. We've already had CPS called many, many times and she talked her way out of it all so what's the point in recording?"

> <u>Casino</u>: "You can't talk away evidence. You can try to explain it but the more evidence the more difficult it is to discount it."

20

V.A.: "But is that really something they could get in trouble for?"

Casino: "I couldn't say, the determination is based on the weight of the evidence.  So I don't think any one thing would give you a definitive answer."

**FACTS RELATING TO V.A.'S SUICIDE ITSELF**

60.

On November 4, 2020, V.A. went into the woods with her dog, two phones, and a handgun.

61.

While she was in the woods, she was on a snapchat call with her friend (a minor), J.T.

62.

She told J.T. she was sorry about everything and placed the phone she was talking to him on onto the ground.

63.

J.T. alerted their other peer, T.J. of the situation, and T.J. reported it to the police.

64.

V.A. ultimately put the gun to her head and pulled the trigger.

65.

V.A. did not die immediately.

66.

The first responding officer on the scene reported that by the time he reached V.A. she was taking shallow breaths and blood was pooling under her.

67.

V.A. died later that day at the hospital.

## FEDERAL LAW CLAIMS

### A.  FIRST CAUSE OF ACTION—§ 1983—STATE-CREATED DANGER CREATED BY CASINO, A PUBLIC OFFICIAL

68.

Starting at least in April 2020 and up until merely days before her death, Casino wove a web around V.A., grooming her to come to him as her go-to source with all her problems.

69.

When she confided in him that she had attempted suicide—and that her mother did not know about it—instead of reporting the incident to the authorities, her parents, or her counselor, Casino doubled-down, and nurtured her growing dependence on him by striking an inappropriately informal tone ("You didn't do it 'cause you're a pussy".; "You might feel like shit, but keep in mind that a lot of other people do too."). Instead of telling V.A. to get help, he nurtured her dependence on him by giving her instructions that further isolated her from the outside world by coaching her to deal with it herself, with *his* guidance ("Now I'll refrain from saying what that kind of behavior is, but to curb it, you really do need to take time to assess yourself.").

70.

Similarly, when V.A. confided in Casino her fear of her alleged rapist committing suicide, after she said she didn't wanted to send it to the counselor, he sent the information about the alleged rapist to the counselor himself. He even praised V.A. for doing her responsibility by reporting it

to him. ("I texted the counselor about it.  I also sent the screenshot.  You also know why, let them handle it.  You did what was your responsibility and you should be proud of yourself for that.").

71.

Casino, under color of law, deprived V.A. and her parents of rights, privileges, and immunities secured to them by the United States Constitution, including the right to due process under the Fourteenth Amendment—specifically the right to be free from affirmative actions directly increasing V.A.'s vulnerability or otherwise placing her in danger and taking away from her parents her ability to protect her and inflicting unjustified intrusions on her emotional well-being—inflictions so severe that they gave her panic attacks and drove her to suicide.

72.

Casino acted with deliberate indifference when he put V.A.'s life at risk and caused her to suffer greatly before her death.  Casino acted with deliberate indifference when he concealed from her parents the peril V.A. was in at school from dangerous and ongoing bullying, causing Mr. and Mrs. Armshaw serious emotional distress when they could not protect their daughter.

73.

Casino—cloaked in the authority a teacher has over a student—affirmatively abused his position of authority through his ongoing choice to communicate with V.A. at all hours of day at night, even when she was no longer a student of his, and by taking advantage of her fragile emotional state—which he knew about because she told him about her rape, previous suicide attempt, and the bullying she was undergoing.  He used his position—and even his official school email—to cozy up to her and build her dependency on him.

23

74.

Fearing the repercussions of having the extent of his relationship with V.A. revealed, he affirmatively undertook a responsibility to handle her issues himself, and trained V.A. to come to him—not her parents or anyone else—when she was struggling.   This self-serving and manipulative behavior of a fragile, traumatized girl shocks the conscience.

75.

Likewise, V.A.'s suicide was foreseeable to Casino.  He knew she had ongoing depression. He knew she had been raped.  He knew she felt betrayed by her friend, T.J.  He knew she had attempted suicide once before and that her mother did not know about that incident.  He knew that she was contemplating suicide (since he asked Williams to send her suicide resources).   Yet, despite all this knowledge, he continued to play unlicensed psychiatrist to V.A..

## B. SECOND CAUSE OF ACTION—§ 1983—SPECIAL RELATIONSHIP WITH DEFENDANTS

76.

Defendants have, under color of law, deprived V.A. and her mother of rights, privileges, and immunities secured to them by the United States Constitution, including the right to due process under the Fourteenth Amendment, and specifically the right to be kept safe when a special relationship has been created and by taking away from her parents their ability to protect her.

77.

Defendants' actions put V.A.'s life at risk and caused her to suffer greatly before her death, the source/origin of which was personal physical injury.  Defendants acted with deliberate

indifference when they concealed from her parents the danger V.A. was in at school, causing them serious emotional distress when Mr. and Mrs. Armshaw could not protect their daughter.

78.

Minor children—including V.A. and those that bullied and attacked her at school—are within the custody and control of the school employees and officials.  As such, Defendants had a special relationship to protect her from the attacks and bullying that occurred on school property, to protect her from the knife being thrown at her, and to report these ongoing dangers to her parents so that she could be protected and get the psychological treatment she needed.

## LOUISIANA LAW CLAIMS

### C.  THIRD CAUSE OF ACTION—DIRECT NEGLIGENCE OF NOMMA, LDE, AND BESE—FAILURE TO PROVIDE AN ADEQUATE SUICIDE PREVENTION POLICY TO SCHOOL OFFICIALS, TEACHERS, AND COUNSELORS

79.

As a result of NOMMA's refusal to follow the law and provide mandatory suicide prevention training or any other suicide prevention rules and regulations, Williams was not trained on how to respond to suicide risks like V.A.'s, resulting in her sending generic resources rather than investigating and following a clear school policy.  If she had been trained, V.A.'s parents would have gotten her the help she needed.

80.

As a result of NOMMA's refusal to follow the law and provide mandatory suicide prevention training or any other suicide prevention rules and regulations, Casino was not trained on how to respond to suicide risks like V.A.'s.  Because he did not have clear reporting procedures

that he was required to follow, he decided to offer V.A. suicide counseling himself (telling her she was just looking for attention), and even though he was not qualified to act as a counselor.

81.

Upon information and belief, neither the LDE nor BESE provided any suicide prevention training to either NOMMA administrators, Casino, or to Williams.  As a result of LDE's and/or BESE's failure to have suicide prevention training requirements for its schools and the school employees, Casino and Williams were left to their own devices—with fatal consequences.

### D.  FOURTH CAUSE OF ACTION— FAILURE TO REPORT BULLYING

82.

NOMMA and/or LDE and/or BESE had bullying policies that required school employees to report all bullying incidents.

83.

Casino was a NOMMA employee who knew V.A. was being bullied.

84.

Casino never reported the bullying.

85.

This failure to report exposed V.A. to prolonged, repeated bullying without any school or parish intervention or remediation of the issue.

86.

But for this failure to report, NOMMA and/or LDE and/or BESE and/or V.A.'s parents could have prevented further bullying exposure and gotten V.A. the treatment she needed, which would have prevented her death.

87.

Casino is directly at fault for this failure to report.  As a NOMMA employee, NOMMA is vicariously liable for Casino's failure to report the bullying.

88.

This failure to report arose from his selfish, malicious desire to continue his inappropriate relationship with V.A., rather than protecting and teaching her.  By violating the reporting rule, he was flouting the specific guidelines for school employee behavior as established by NOMMA and LDE and/or BESE.

**FIFTH CAUSE OF ACTION—GROSS NEGLIGENCE, OR IN THE
ALTERNATIVE NEGLIGENCE, OF CASINO**

89.

Mr. Casino is answerable for Mr. and Mrs. Armshaw's losses and for V.A.'s fright, fear, and mental anguish during the ordeal leading to her death as well as pain and suffering following the gunshot wound prior to her death pursuant to Articles 2315, 2315.1, and 2315.2, of the Louisiana Civil Code and to La. R.S. 17:1416.13, and La. R.S. 17:437.1, and because his actions and inactions were a cause-in-fact of the incident in question.

90.

27

Upon information and belief, at all times material hereto, Mr. Casino was a teacher at and employee of V.A.'s school, NOMMA and had been her biology teacher.  Because of this, he had a special legal relationship with her and had a duty of care to conduct himself in interacting with his students so as not to expose them to unreasonable risks.  This duty is heightened when there is actual knowledge of fragile students/special needs.

91.

Mr. Casino did foresee or should have foreseen that V.A. would kill herself because he had actual knowledge of her fragile emotional state, including a prior suicide attempt, the persistent bullying and harassment she was subjected to by her peers, her continued suicidal ideations for herself, and the trauma associated with her rape and the suicide threats made by her ex-boyfriend, M.  Mr. Casino also knew that these types of risks should be immediately reported—at least to the NOMMA counselor—because when he heard about similar threats by M. via V.A., he immediately notified the counselor, Williams, about that situation.  Yet, for V.A.—with whom he had been having a prolonged, inappropriate grooming relationship for months—he stopped short of full reporting.  Indeed, he chose not to act for months on end, even though he knew she had been sexually assaulted, even though he knew she had already attempted suicide, and even though he knew that she remained in a fragile state.  Instead, he merely asked that Williams provide her with generic resources.  Upon information and belief, the reason he did not report V.A.'s suicidal nature (as he had done when he heard about M.'s) was because he was afraid it would lead to the discovery of his extensive, inappropriate, grooming relationship with her.

92.

In particular, Casino is at fault in each or all of the following respects, which arose from his malicious desire to groom V.A. against her own best interests:

A.  Choosing to remain silent (instead of reporting) the bullying and harassing behavior by T.J. and other peers;

B.  Choosing to remain silent (instead of reporting) M.'s rape of V.A.'s parents, child protective services, the police or other authorities, and NOMMA;

C.  Choosing to remain silent (instead of reporting) V.A.'s claimed suicide attempt to V.A.'s parents, child protective services, the police or other authorities, and NOMMA;

D.  Choosing to remain silent (instead of reporting) V.A.'s ongoing suicidal ideations to V.A.'s parents, child protective services, the police or other authorities, and NOMMA from the time of spring 2020 through October 2020;

E.  Failure to communicate with V.A.'s parents at any time about all of the above issues, or in the alternative failure to comply with NOMMA's parent contact log protocols;

F.  Grooming a minor, including communicating at length with a minor regarding intimate details of her life, including late-night emails and phone calls and communications over the summer (when school was not in session) for matters completely unrelated to their formal, teacher-student relationship;

G.  Failure to notify V.A.'s parents of the pervasive bullying, abuse, and harassment she was undergoing (in violation of La. R.S. 416.13);

H. Exacerbating V.A.'s fright, fear, and mental anguish during the months leading to her death, with each unreported event relentlessly chipping away at her psychological well-being because her parents (unaware of all of this), were unable to get her the help that would have saved her life, since they did not know about these unreported issues;

I. Feeding V.A.'s unhealthy obsession with him through his regular, extensive, and intimate communications with her completely separate and apart from his work-related duties;

J. Upon information and belief, deleting his communications with V.A. after her death; and

K. Upon information and belief, the willful and wanton choice to remain silent to protect his own career despite all of this knowledge.

These violations flouting the specific guidelines for school employee behavior established by NOMMA, the LDE, and BESE.

### INJURIES AND DAMAGES

93.

Mr. and Mrs. Armshaw, as the survival claimants herein on behalf of V.A., would show that V.A. experienced fright, fear, and mental anguish and emotional distress during the ordeal leading to her death as well as pain and suffering following the gunshot wound prior to her death, and—ultimately—death as a result of the Defendants' acts and omissions as set forth above.

94.

Mr. and Mrs. Armshaw, as the wrongful death claimants named herein, bring their wrongful death claims for the death of their daughter, V.A..  Mr. and Mrs. Armshaw would show that they have lost the love, affection, and companionship of V.A..  Mr. Armhaw and V.A. had a

close relationship; he referred to her as "Sweet." Mrs. Armshaw also had a close relationship with her daughter.  They joked around together, and V.A. liked it when her mother would be silly with her, such as by using her silly nickname that replaced the first letter of V.A.'s first name with a "B."  Another example is that the whole family, including Mr. and Mrs. Armshaw and V.A. celebrated Mr. Armshaw's 40th birthday together.  Mr. and Mrs. Armshaw also lost the services provided to them by V.A.; V.A. did tutoring and babysitting of her siblings and helped around the house by mowing the grass and cooking and baking food for the household, among other things. They have also experienced mental pain, suffering, and distress as a result of V.A.'s death and upon information and belief have incurred funeral expenses. They are also likely to incur medical expenses as a result of the psychological treatment they will require because of V.A.'s wrongful death.

95.

As a direct result of the above-described incident, Mr. and Mrs. Armshaw seek recovery against the Defendants, jointly, severally, and/or *in solido*, for all damages to which they are entitled as wrongful death claimant, including, but not limited to:

A.  Loss of love, affection, and companionship of their daughter, V.A.;

B.  Loss of service and support because of the death of their daughter, V.A.;

C.  Mental pain, suffering, and distress because of the wrongful death of their daughter, V.A.;

D.  Funeral expenses for their daughter, V.A.; and

E.  Medical expenses as a result of the psychological treatment necessitated by the wrongful death of their daughter, V.A.

96.

WHEREFORE, Mr. and Mrs. Armshaw pray that Defendants, NEW ORLEANS MILITARY AND MARITIME ACADEMY, INC and VOLTAIRE ALEXANDER CASINO, and after being duly cited to appear and respond thereto and after the expiration of all legal

delays and due proceedings are had, that there be a judgment in favor of them and against all Defendants in an amount of damages reasonable and found reasonable at trial together with legal interest thereon from the date of judicial demand until paid in full, as well as all costs and attorneys fees of these proceedings and all other general and equitable relief.

Respectfully Submitted,

**BAER LAW, LLC**

BY:   _____*/s/ Jason M. Baer*_____
**JASON M. BAER (# 31609)**
**CASEY C. DEREUS (#37096)**
**JOSHUA A. STEIN (# 37885)**
3000 Kingman Street, Suite 200
Metairie, LA 70006
Telephone: (504) 372-0111
Facsimile: (504) 372-0151
Email: jbaer@baerlawllc.com
Email: cdereus@baerlawllc.com
Email: jstein@baerlawllc.com
*Counsel for Plaintiff*

*And*

*SIGNATURE BOCK CONTINUED ON FOLLOWING PAGE*

**THE KING FIRM, LLC**
**BRIAN KING, (Bar Roll No. 24817)**
**JASON F. GILES (Bar Roll No. 29211)**
2912 Canal Street
New Orleans, LA  70119
Telephone:     (504) 909-5464
Facsimile:     (800) 901-6470


## CERTIFICATE OF SERVICE

I do hereby certify that I have on this 12th day of October, 2021, served a copy of the foregoing pleading to all parties to this proceeding by facsimile, electronic mail and/or depositing same in the United States Mail, properly addressed and postage prepaid.


_____*Jason M. Baer* _____
JASON M. BAER